IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs November 3, 2021

**STATE OF TENNESSEE v. DESEAN ALLEN BLACKMAN**

**Appeal from the Circuit Court for Madison County**
**No. 19-232    Roy B. Morgan, Jr., Judge**

_____

**No. W2020-01696-CCA-R3-CD**

_____

The Appellant, Desean Allen Blackman, was convicted in the Madison County Circuit Court of two counts of aggravated sexual battery, a Class B felony, and received concurrent nine-year sentences to be served at one hundred percent. On appeal, the Appellant contends that the evidence is insufficient to support the convictions and that the trial court erred by allowing a law enforcement officer to testify that the Appellant invoked his right not to speak with the officer. Based upon the record and the parties' briefs, we conclude that the evidence is sufficient to support the convictions. We also conclude that the trial court erred but that the error was harmless beyond a reasonable doubt. Accordingly, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and TIMOTHY L. EASTER, J., joined.

M. Todd Ridley, Assistant Public Defender - Appellate Division (on appeal), Franklin, Tennessee, and Jeremy B. Epperson, District Public Defender (at trial), Jackson, Tennessee, for the appellant, Desean Allen Blackman.

Herbert H. Slatery III, Attorney General and Reporter; Kayleigh Butterfield, Assistant Attorney General; Jody S. Pickens, District Attorney General; and Lee R. Sparks, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I.  Factual Background**

In April 2019, the Madison County Grand Jury indicted the Appellant for one count of rape of a child and one count of aggravated sexual battery. The Appellant went to trial in August 2020.

At trial, the fourteen-year-old victim testified that she was born on July 29, 2006, and lived in Memphis. In July 2018, when the victim was still eleven years old, she went to visit her aunt, H.S., in Jackson.[1] The Appellant and his daughter, who was one year younger than the victim, also were there. On July 19, the victim started her period and was "cramping." H.S. gave the victim pain medication and went to work. The victim later went into H.S.'s bedroom and rested on the bed. She fell asleep but awoke to find the Appellant lying beside her and rubbing her stomach. The Appellant was watching a football game on his cellular telephone. The victim said that she fell asleep again and that she awoke to the Appellant standing over her. The Appellant pulled her pants and panties down to her ankles and put his fingers inside her vagina. The Appellant said something to the effect of "'Dang, you're wet.'" The victim stated that the Appellant then "proceed[ed] to hold me down and try to put his penis inside of me." She said that she was scared and tried to "fight it off" but that the Appellant was too strong. The State asked, "Did it hurt?" The victim responded, "Physically, yes, but also no." She said that the Appellant did not ejaculate and that she did not remember if he touched her breasts.

The victim testified that the Appellant's daughter was in the bedroom at the time of the incident but was playing a video game and wearing headphones that fully covered her ears. When the Appellant "got done," the victim "curled up in the bed." The Appellant went into the kitchen, and the victim could hear him "clicking his nails." The victim thought to herself, "I got to get out of this house." She texted another aunt that "I need to talk to you right now." That aunt contacted the victim's mother and H.S., who telephoned the Appellant. The victim heard the Appellant tell H.S., "'Everything's fine. What's wrong?'" The Appellant handed the telephone to the victim. The victim went to the back of the house, and the Appellant followed her. The victim said she told H.S. that nothing had happened and that everything was fine because the Appellant was standing in front of her "with his fist balled up."

The victim testified that after she talked with H.S., the Appellant told his daughter to get her "stuff." He and his daughter left H.S.'s home, and H.S. and the police arrived. The victim said that before the Appellant left, he told her, "'You know I was just only trying to make you feel better.'"

On cross-examination, the victim testified that she arrived at H.S.'s home three or four days before this incident. The home had two bedrooms, but H.S. used one bedroom as a game room, so the victim and the Appellant's daughter slept on the couch in the living room. The victim said that when she went into H.S.'s bedroom to rest, she may have shut

---

[1] In order to protect the victim's identity, we will refer to her aunts by her their initials.

the door. The victim said she did not remember telling anyone that she ran out of the room crying after the Appellant penetrated her. However, she acknowledged that she may have made that statement.

The victim testified that she went to a hospital and that she spoke with Sergeant Jay Stanfill while she was there. The victim said she did not remember what she told Sergeant Stanfill, explaining that "it was like 1, 2, 3 in the morning. So if I don't remember, I'm sorry, but I was sleepy. I took a lot of medication that day. A lot of stuff happened. I don't really remember what I said, and I'm sorry if I don't." The victim stated that she spoke with many people at the hospital but that she remembered speaking with only one nurse, Mary Cole. The victim said she did not remember telling Ms. Cole that the Appellant did not hold her down. The victim acknowledged telling Sergeant Stanfill that she was not injured or in pain but then telling Nurse Cole that she was in pain. The victim said she did not remember telling a second nurse that the Appellant inserted only his penis into her vagina.

On redirect-examination, the victim testified that although Sergeant Stanfill and the nurses wrote down what she told them, she had no control over what they wrote. On recross-examination, the victim testified that her answers may have changed while she was at the hospital because her physical condition changed.

H.S., the victim's aunt, testified that in July 2018, she was living in Jackson and that the victim came to visit because the victim was out of school for the summer. The Appellant and his daughter also were there. On July 19, the victim started her period and was having menstrual cramps, so H.S. gave her pain medication. H.S. worked "evenings" and left for work about 2:00 p.m. She said everything was "[f]ine" at home at that time.

H.S. testified that she later received a message from one of her sisters. The message "alarmed" H.S., so she talked with the victim on the telephone and "could tell by her voice that something was wrong." H.S. returned home, and the victim was there alone. H.S. spoke with the Appellant on the telephone, and he told her that he was taking his daughter home and was on his way to Memphis. However, the Appellant returned to H.S. residence, and the police arrested him.

H.S. testified that the Appellant later telephoned her from jail. During their conversation, the Appellant told her that he rubbed the victim's stomach but that he did not do anything else to the victim. A few days later, H.S. had a second jailhouse telephone conversation with the Appellant. The Appellant told her that he awoke with his hand between the victim's legs and that the victim was "'pleasuring herself'" with his hand. He claimed that he "jump[ed] up" and that he asked the victim if she was hungry. The State played both of the audio-recorded calls for H.S., and she acknowledged that the Appellant's second version of events was a "significant change" from his first version. H.S. did not have any further contact with him.

On cross-examination, defense counsel questioned H.S. about her second jailhouse telephone conversation with the Appellant, and she acknowledged that he said he was scared when he discovered his hand between the victim's legs. He also said during the conversation that the victim had told H.S. that the victim was sexually active. H.S. did not verbally respond to the Appellant when he made that statement. The Appellant told H.S. that the State had swabbed his penis and that the only DNA the State was going to find on the swabs was H.S.'s DNA because they had had sexual intercourse the night before the victim made her allegations. The Appellant claimed that the victim was not receiving attention from her father at home and that she was trying to get attention from the Appellant.

H.S. acknowledged that she and the Appellant had sex on the night of July 18. She stated that she spoke with a female police officer on the night of July 19 but that she did not give the police a written statement. Defense counsel showed H.S. a police officer's report, and H.S. said she did not remember telling the officer that she thought the victim was sexually active and that she thought the victim was making up the allegations against the Appellant because H.S. was going to tell the victim's mother. H.S. told the jury, "[The victim] never made me aware of the fact that she may or may not be sexually active. This story comes from [the Appellant]." On redirect-examination, H.S. acknowledged that she initially did not believe the victim's allegations but changed her mind after her second jailhouse conversation with the Appellant.

Officer Ryan Briscoe of the Jackson Police Department (JPD) testified that about 7:30 p.m. on July 19, 2018, he received a call about a juvenile being raped by an aunt's boyfriend. He went to H.S.'s residence and spoke with M.M., who was one of the victim's aunts. Officer Robert Jaggers of the JPD testified that he arrived at the home to assist Officer Briscoe and that a man drove by the residence. A family member identified the man as the Appellant, so Officer Jaggers initiated a traffic stop. The Appellant continued to drive about one-quarter mile before he stopped his car. On cross-examination, Officer Jaggers acknowledged that the Appellant did not drive "very far" before stopping and that the Appellant consented to a search of his vehicle.

Sergeant Jay Stanfill of the JPD testified that the victim was transported to a hospital for a sexual assault examination and that he met with her in a small room prior to the exam. He acknowledged that some of the victim's testimony differed from what she told him during her interview. After Sergeant Stanfill met with the victim, he prepared arrest warrants for the Appellant and a search warrant for the Appellant's DNA. The search warrant was executed on the Appellant that night at the hospital; a nurse obtained penile swabs from him. The Appellant then was transported to jail. Sergeant Stanfill gave <u>Miranda</u> warnings to the Appellant and attempted to interview him, but the Appellant "chose to remain silent and have representation."

- 4 -

Sergeant Stanfill testified that prior to speaking with the Appellant, he was able to view the Appellant on a monitor in the interview room and saw the Appellant "intently cleaning his fingernails" with tissues. Sergeant Stanfill later inspected the tissues and noticed "small red specks" on them.

On cross-examination, Sergeant Stanfill testified that he interviewed the victim about 1:00 or 2:00 a.m. on July 20. The victim appeared to be tired but did not appear to be under the influence of any substance. The victim, who was just eleven years old, indicated that she knew what a condom was and that the Appellant did not wear one. The victim told Sergeant Stanfill that she had deleted some text messages from her telephone. However, the victim had sent the messages to one of her aunts, and that aunt provided the messages to the police. Sergeant Stanfill acknowledged that he asked the victim if she was "hurting from any injury in her vaginal area" and that the victim said she was not injured or in pain. After Sergeant Stanfill spoke with the victim, Ms. Cole spoke with the victim and examined her.

Sergeant Stanfill acknowledged that H.S. expressed "some concern" that the victim was lying. Sergeant Stanfill identified the report he prepared in the victim's case and acknowledged that he wrote, "'[H.S.] stated that she did not believe her niece.'" He also wrote, "[H.S.] believed that [the victim] was sexually active and [H.S.] was going to tell [the victim's] mother, so [the victim] made this incident up." Sergeant Stanfill said that he sent the following items to the Tennessee Bureau of Investigation (TBI) for analysis: buccal and vaginal swabs obtained from the victim, the victim's underwear, "a menstrual pad that was dried," buccal and penile swabs obtained from the Appellant, the Appellant's clothing, and two tissues.

Mary J. Cole, a registered nurse at Jackson General Hospital and a certified sexual assault examiner, testified as an expert that she spoke with the victim and her mother on the night of the victim's allegations. Ms. Cole then spoke with the victim alone. Ms. Cole stated that according to her notes, the victim said she was lying on her back on her aunt's bed and that the Appellant was lying beside her. The Appellant rubbed the victim's "tummy" and breasts with his hands. The Appellant then "put his hands down [her] shorts and rubbed and inside." At some point, the Appellant "was standing." He pulled down the victim's underwear to her feet and "put in and pulled out." The victim did not think the Appellant ejaculated. Ms. Cole said that she asked the victim about pain and that the victim "pointed toward her private."

Ms. Cole testified that she physically examined the victim and that she saw menstrual blood on the outside of the victim's genitalia. The victim told Ms. Cole that the Appellant put his fingers and penis inside her vagina. Ms. Cole did not see any trauma to the victim's hymen or anal area, and the victim's physical examination did not show any acute injury. Ms. Cole inserted swabs into the victim's vagina to collect evidence, and the insertion of the swabs appeared to be painful for the victim.

On cross-examination, Ms. Cole testified that she examined the victim about 2:00 a.m. on July 20. The victim had not taken a shower and was wearing the same bra and underwear she had worn on July 19. Ms. Cole acknowledged that the victim alleged digital and penile penetration but that the victim's physical examination did not confirm those allegations. The victim did not tell Ms. Cole that the Appellant had restrained her, and the victim did not mention any threats. However, Ms. Cole did not specifically ask the victim if the Appellant had threatened her. Ms. Cole noted in her report that the Appellant's hands had contacted the victim's menstrual blood.

Ms. Cole acknowledged that Carol Lambert, a registered nurse, was the first nurse to speak with the victim in the emergency room on the night of July 19. According to Ms. Lambert's report, the victim claimed the Appellant penetrated her vagina with his penis but denied any other penetration. Ms. Lambert's report also said the victim was not in pain. Ms. Cole was not present when the victim spoke with Ms. Lambert.

Christy Smith, a special agent forensic scientist with the TBI, testified as a DNA expert that she analyzed the evidence collected in this case for the presence of semen, saliva, and blood. Chemical testing of the victim's vaginal swabs did not show the presence of spermatozoa, and Agent Smith did not see spermatozoa on the swabs. Agent Smith explained that "[t]ypically, spermatozoa is not present without ejaculation." Semen was not present on the victim's underwear or sanitary pad. Agent Smith not see any blood on the Appellant's clothing, and chemical testing of his clothing did not show the presence of blood.

Agent Smith testified that a mixture of DNA was on the Appellant's penile swabs and that the mixture came from two people: the Appellant and an unknown female. Agent Smith saw "some staining" on the two tissues collected by Sergeant Stanfill. Agent Smith obtained a "limited DNA profile" on one of the tissues. The profile included at least one male, but Agent Smith did not obtain enough of the profile to identify him. Agent Smith found a mixture of DNA on the second tissue, and at least three people contributed to the mixture. One of those individuals was a male, but the mixture was too complex for further analysis. Agent Smith said that the lack of DNA evidence did not negate that contact could have occurred between the victim and the Appellant.

On cross-examination, Agent Smith testified that she did not find any male DNA on the victim's vaginal swabs and that the victim was excluded as a contributor to the DNA mixture on the Appellant's penile swabs. Agent Smith requested a DNA sample from the Appellant's "partner" to eliminate her as a contributor to the mixture but never received one. Agent Smith acknowledged that she did not find the victim's DNA on the Appellant and that she did not find the Appellant's DNA on the victim. At the conclusion of Agent Smith's testimony, the State rested its case.

S.K., the Appellant's twelve-year-old daughter, testified that she was ten years old in July 2018. On July 19, S.K. and the Appellant were at H.S.'s home. S.K. and the victim had been staying there for a few days and slept in the "front room." The Appellant and H.S. slept in the bedroom.

S.K. testified that the Appellant was "in the bed." The victim was "on her cycle" and did not feel well, so she got into the bed with him. S.K. was hungry and kept going into the bedroom to ask the Appellant for something to eat. She said that the Appellant was lying on the bed but was not asleep and that he "started rubbing [the victim's] belly I guess to make her feel better." The Appellant and the victim were above the covers.

S.K. testified that she had been playing a video game earlier but that she was not playing a video game at that time. S.K. was in the living room, but she could see what was happening in the bedroom because the bedroom door was open. She said that she never saw the Appellant do anything but rub the victim's stomach and that she never saw the Appellant standing next to the victim. The victim exited the bedroom first and was walking normally. She was not angry or crying but "got right on her phone." The Appellant came out of the bedroom and told S.K. to get her belongings because he was going to take her home. S.K. and the Appellant left H.S.'s home ten to twenty minutes later but ended up returning to the residence. At the conclusion of S.K.'s direct testimony, she said that she never saw the Appellant put his fingers or penis inside the victim. Defense counsel asked if S.K. had been "paying attention to what was going on in there," and she answered, "Yes, sir." Defense counsel asked why she had been paying attention, and S.K. responded, "Because I knew something wasn't right."

On cross-examination, S.K. testified that she did not meet with defense counsel prior to giving her testimony. She acknowledged telling Sergeant Stanfill that she saw the Appellant rubbing the victim's stomach and that she did not see anything in the bedroom. S.K. denied telling Sergeant Stanfill that she saw the Appellant rubbing the victim's stomach in the living room. S.K. stated, "I had went inside their bedroom, and I saw my daddy rubbing [the victim's] stomach, so I knew something was up, so I kept going into the room asking him for things." The Appellant told S.K. to leave him alone, so S.K. went into the living room and sat on the couch. However, she kept looking into the bedroom and "kept checking what was going on." On redirect-examination, S.K. testified that she could see into the bedroom from the couch and that she did not see anything inappropriate occur between the Appellant and the victim.

Katricia Cobbs, S.K.'s mother, testified that she was present when S.K. met with Sergeant Stanfill and when S.K. gave a statement to Sergeant Stanfill. Sergeant Stanfill told Ms. Cobbs that he would contact Ms. Cobbs in a couple of days in case S.K.'s statement changed, but Ms. Cobbs never heard from him. Ms. Cobbs said S.K.'s statement never changed.

The Appellant testified that in July 2018, he was in a relationship with H.S. On July 18, he and his daughter, S.K., were at home with H.S. and the victim. The Appellant made breakfast for the two girls and cleaned the house. H.S. told the Appellant that the victim was "experiencing her menstrual cycle" and told him "to keep an eye on" the victim. H.S. went to work, and the Appellant stayed home with S.K. and the victim.

The Appellant testified that the victim was "lacking a father figure or any affection from home" and that he tried to show her some attention. However, S.K. kept getting jealous and "would start acting out for affection." The victim was in pain due to her menstrual cycle and asked the Appellant to rub her stomach. The Appellant explained to the jury, "There's a motion you can do with your stomach that will help with [menstrual pain], and that's what I demonstrated for her." The Appellant rubbed the victim's stomach in the living room, and S.K. was present.

The Appellant testified that he went into the bedroom and fell asleep. At that time, S.K. and the victim were in the living room. The Appellant said that he awoke with his hand "lower than [the victim's] abdomen" and that he "jump[ed] up." He asked the victim what she was doing and "why she was thinking that was okay." The Appellant acknowledged telling H.S. that the victim was "pleasuring herself." He said that by "pleasuring herself," he meant the victim "was easing my hand past her abdomen."

The Appellant testified that the bedroom door was open "the whole time" because he was "babysitting" S.K. and the victim. He said that the victim's actions "scared the hell out of [him]" and that he never would have done anything to jeopardize his "opportunity to have sole custody" of S.K. The Appellant immediately texted H.S. at work that he needed to speak with her, and the victim went into the living room and "got on her cellphone." H.S. telephoned the Appellant, and he told her that he would "explain everything" when she got home. The Appellant stated that S.K. "did tell me that she was hungry" and that he told her to leave him alone.

The Appellant testified that he wanted to remove himself and S.K. from "that situation" as soon as possible, so he told her to get her belongings. The Appellant and S.K. left H.S.'s home but never left Jackson and returned to H.S.'s residence. The Appellant said that he did not put his fingers or penis inside of the victim and that he thought H.S.'s DNA was on his penile swabs because he and H.S. had had sex early that morning or the previous night.

On cross-examination, the Appellant testified that earlier that day, the victim had been dressed inappropriately. The victim claimed she was hot, but the Appellant told her that "that was no excuse for her to be walking around the house, you know, around me, like that." The victim put on a pink t-shirt and a pair of shorts. The Appellant said that after H.S. left for work and he finished cleaning, he "went to go lay down" in the bedroom. He awoke on the bed with the victim, who was clothed, lying beside him. The Appellant

said his hand was not between her legs but "was headed there." The Appellant asked the victim "why did she do it," and the victim told him, "'I didn't want you to tell [H.S.] about what, you know, we had discussed.'" The Appellant said he and the victim had discussed the victim's being sexually active. He stated that the victim "was dating like [an] older guy and she was dating the younger brother as well" and that he and H.S. were planning to tell the victim's mother.

During closing arguments, the State advised the jury that it was relying on proof of the Appellant's "very brief and very shallow insertion of his penis" into the victim's vagina for the offense of rape of a child and that it was relying on proof of the Appellant's "touching her vagina with his hand" for the offense of aggravated sexual battery. The jury found the Appellant guilty of aggravated sexual battery, a Class B felony, as charged in the indictment but convicted him of aggravated sexual battery as a lesser-included offense of rape of a child. After a sentencing hearing, the trial court sentenced him as a Range I, standard offender to concurrent nine-year sentences to be served at one hundred percent.

## II. Analysis

### A. Sufficiency of the Evidence

The Appellant claims that the evidence is insufficient to support the convictions because the proof fails to show that he touched the victim's intimate parts or that he did so "for the purpose of sexual arousal or gratification." The State argues that the evidence is sufficient. We agree with the State.

When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury. Id. Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

A guilty verdict can be based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Hall, 976 S.W.2d 121, 140

(Tenn. 1998). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting Marable v. State, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)).

Although the Appellant was charged with one count of rape of a child and one count of aggravated sexual battery, the jury convicted him of two counts of aggravated sexual battery. We note that "[r]ape of a child is the unlawful penetration of a victim by the defendant or the defendant by a victim, if the victim is more than eight (8) years of age but less than thirteen (13) years of age." Tenn. Code Ann. § 39-13-522(a). Aggravated sexual battery as charged in this case is "unlawful sexual contact with a victim by the defendant" and the victim is less than thirteen years old. Tenn. Code Ann. § 39-13-504(a)(4). "Sexual contact" is defined as "the intentional touching of the victim's . . . intimate parts . . . if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification." Tenn. Code Ann. § 39-13-501(6).

The victim testified that the Appellant put his fingers inside her vagina and that he tried to put his penis inside her vagina. Afterward, the victim texted an aunt, who contacted H.S. H.S. testified that she received an alarming message from one of her sisters and that she telephoned the Appellant. The Appellant had H.S. speak with the victim, and H.S. could tell from the victim's voice that something was "wrong." Although the victim told H.S. that nothing had happened, the victim said she lied to H.S. because the Appellant was standing in front of her with his fist "balled up." The victim was transported to a hospital where she told two nurses that the Appellant had penetrated her vagina. Although the victim told one nurse that the Appellant had penetrated her with his penis, she told the second nurse that he had penetrated her with his penis and his fingers. Despite the victim's inconsistent accounts of what occurred, the jury obviously resolved those consistencies in favor of the State and concluded that the Appellant intentionally touched the victim's intimate parts with his fingers and his penis.

As to the Appellant's claim that the evidence is insufficient to show that he touched the victim for the purpose of sexual arousal or gratification, the victim testified that upon putting his fingers inside her vagina, he said, "Dang, you're wet." Based on the Appellant's statement, it was reasonable for the jury to conclude that the touching was for the purpose of sexual arousal or gratification. Therefore, taken in the light most favorable to the State, we conclude that the evidence is sufficient to support the convictions.

B. Right to Remain Silent

- 10 -

The Appellant contends that the trial court committed reversible error by allowing Sergeant Stanfill to testify that he tried to interview the Appellant but that the Appellant invoked his right not to speak with the officer. The State argues that the trial court did not err and, in the alternative, that the error was harmless because the evidence against the Appellant was overwhelming. We conclude that the trial court erred but that the error was harmless.

During Sergeant Stanfill's testimony, he stated that the Appellant was transported to the police department "where we attempted to interview him later on." The State asked if the Appellant "cooperat[ed] in that interview," and Sergeant Stanfill answered, "No, he chose not to." Defense counsel objected and stated, "Fifth Amendment, Your Honor. Can we approach?"

At the bench, defense counsel advised the trial court that the Appellant did not speak with Sergeant Stanfill because the Appellant invoked his right to counsel and, therefore, that the State should not be allowed to ask Sergeant Stanfill about the Appellant's interview. The State responded, "What I asked is whether he cooperated or not. If he asserted his right to counsel, I think he's free to say he asserted his right to counsel." Defense counsel maintained that the sergeant's testimony was improper under the Fifth Amendment. The following colloquy then occurred:

[The State]: Well the fact that he didn't give a -- I'm not -- It's a fact. It's not being assigned a value. It's not being held against him. Either he did or he didn't. I don't see how -- I don't think that that --

[Defense counsel]: And then I would say it's not even relevant then.

THE COURT: General?

[The State]: Well it's relevant, the fact whether he cooperated or not.

[Defense counsel]: At least for that purpose, again, I would refer back to the Fifth Amendment.

The trial court asked if defense counsel could cite any cases in support of his position, and defense counsel said that he did not know of any specific cases but that "if a defendant invokes his right . . . to an attorney under the Fifth Amendment, . . . that fact is not to be referenced and to be held against him in any way whatsoever." The parties continued as follows:

[The State]: This is not a statement given by the Defendant though. This is a statement being given by someone else, and whether -- I mean, he has absolutely -- I agree, he has absolute right not to testify, not to give a

- 11 -

statement, but that right does not blanket and keep everybody else from saying anything about that. I think that that is well beyond the confines of the right. The rights to the individual [do] not encumber [every]one.

THE COURT: I'm going to allow the State to pursue with the questions, the proper foundation laid, whether or not he was given his Miranda rights and was a statement given. I'll let you ask and answer.

[Defense counsel], you can cross-examine like you have in many cases regarding defendants' rights. I'll give any special instruction if you find any law, but that would be the end of it.

You can't go any further than that. I think you've got to lay the foundation as to process and procedure that was followed. And you can even ask, General, what you wish about a defendant's right.

I'm going to overrule [defense counsel's] objection based on his lack of supplying any law or foundation.

After the bench conference, the State continued questioning Sergeant Stanfill as follows:

Q      Investigator Stanfill, I believe where you were when we stopped here, I apologize, you transported [the Appellant] from the hospital to CID I believe?

A      That's correct, our headquarters.

. . . .

Q      And did you properly Mirandize him?

A      Yes. We advised -- We have a written copy of one's Miranda rights and read that.

. . . .

Q      Well just tell us what those rights are.

A      Basically, you have the right to remain silent if you choose to, and you have a right to an attorney if you choose to have one present before any questions are asked, and you're not obligated to answer any questions,

some of the questions. It's totally up to the defendant what they would like to talk about, if they choose to talk at all.

> Q And these are based on rights given to all of us in the Constitution, correct?
>
> A That's right. It's just based on constitutional rights of every American.
>
> Q And when you attempted to speak with [the Appellant], did he invoke his right[s]?
>
> A. He did. We advised him of rights, and he chose to remain silent and have representation.
>
> Q So he gave no statement, correct?
>
> A That is correct.

Ms. Cole was the next witness to testify. During her testimony, the trial court announced a brief recess. When the parties returned to the courtroom, the trial court asked that the attorneys approach the bench and stated,

> I want to go back again on that issue as far as Miranda and being advised. And this has not been raised by [defense counsel] before in other trials. He's approached it differently obviously. The testimony is such that the investigator, sergeant, that he was Mirandized and he chose not to give a statement and asked for an attorney. That's the end of it. I want to make it very clear that the State can't argue that. You can't argue his right to remain silent in any fashion in the closing argument at all.

The trial court offered to give a curative instruction and asked if defense counsel had "[a]ny other comment." Defense counsel moved for a mistrial and, in the event the trial court denied the motion, accepted the trial court's offer to give a curative instruction. The trial court denied defense counsel's motion for a mistrial. In its final charge to the jury, the trial court instructed,

> Now, the Defendant is presumed innocent, and the burden is on the State to prove his guilt beyond a reasonable doubt. He is not required to give any statement to law enforcement, and his election not to do so cannot be considered for any purpose against the Defendant, nor can any inference be drawn from such fact.

The Fifth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution generally provide a privilege against self-incrimination to individuals accused of criminal activity, which includes a right to remain silent. Case law establishes that a defendant may not be punished at trial for exercising his constitutional right to remain silent. See Doyle v. Ohio, 426 U.S. 610, 618 (1976); Braden v. State, 534 S.W.2d 657, 660 (Tenn. 1976). Therefore, the prosecution generally may not comment about a defendant's post-arrest, post-Miranda silence. See Braden, 534 S.W.2d at 660; State v. Marlin C. Goff, No. E2005-02090-CCA-R3-CD, 2006 WL 2633008, at *10 (Tenn. Crim. App. at Knoxville, Sept. 14, 2006). Likewise, a law enforcement officer should not comment about a defendant's post-arrest arrest or post-Miranda silence. State v. Pender, 687 S.W.2d 714, 719 (Tenn. Crim. App. 1984); Honeycutt, 544 S.W.2d 912, 917 (Tenn. Crim. App. 1976). Nevertheless, an improper comment regarding the invocation of the right to remain silent may be considered a harmless error that does not require the grant of a mistrial. See Honeycutt, 544 S.W.2d 912 at 917-18 (Tenn. Crim. App. 1976); State v. Deangelo Davis, No. W2008-00992-CCA-R3-CD, 2009 WL 1841725, at *5 (Tenn. Crim. App. at Jackson, June 26, 2009).

The State, quoting State v. Dotson, 450 S.W.3d 1, 56 (Tenn. 2014), asserts that case law "'does not impose a prima facie bar against any mention whatsoever of a defendant's right to request counsel, but instead guards against the exploitation of that constitutional right by the prosecutor.'" However, Dotson, is distinguishable from this case. In Dotson, the prosecutor asked a police deputy at trial how he came into contact with the defendant. 450 S.W.3d at 57 n.30. The deputy responded that he was watching two police officers interview the defendant when the defendant "shut down on them" and "didn't want to talk to the two of them anymore." Id. The deputy stated that he went into the interview room and interviewed the defendant himself. Id. On appeal to our supreme court, the defendant claimed that the deputy improperly commented on his invocation of his right to remain silent. Id. at 57. Our supreme court ruled, though, that the defendant did not invoke his right to remain silent and that the deputy "merely informed the jury of the circumstances that caused him to conduct the defendant's interview." Id. at 58. The court also held that the defendant was limited to plain error review because he did not object to the deputy's testimony and did not raise the issue in his motion for new trial. Id. The court determined that because no clear and unequivocal rule of law had been breached, the defendant was not entitled to plain error relief. Id.

Here, over the Appellant's strenuous objection, the trial court allowed the State to continue questioning Sergeant Stanfill about the Appellant's choosing not to give a statement and invoking his right to remain silent. Therefore, we conclude that the trial court erred.

We now must determine the effect of the error. The error at issue is a non-structural constitutional error. See State v. Jackson, 444 S.W.3d 554, 591 (Tenn. 2014); State v. Tyrail Jermaine Cooke, No. E2017-00781-CCA-R3-CD, 2018 WL 3532126, at *12 (Tenn.

Crim. App. at Knoxville, July 23, 2018).  As such, it is the State's burden to demonstrate that the error is harmless beyond a reasonable doubt.  Id.

Although the State elicited the improper testimony from the officer, the Appellant's post-arrest silence "was not submitted to the jury as evidence from which it was allowed to draw any permissible inference."  Greer v. Miller, 483 U.S. 756, 764-65 (1987).  The State did not mention the Appellant's post-arrest silence during closing arguments, and the trial court instructed the jury that it could not consider the Appellant's decision not to give a statement against him or draw any inference from his decision.  We generally presume that the jury follows the instructions of the trial court.  See State v. Butler, 880 S.W.2d 395, 399 (Tenn. Crim. App. 1994); Tenn. R. App. P. 36(b).

Additionally, the evidence against the Appellant was strong.  The victim testified about the Appellant's touching her vagina with his penis and fingers and that she texted one of her aunts after the incident.  The victim's aunt then contacted H.S., who telephoned the Appellant.  H.S. testified that the Appellant had her speak with the victim on the telephone and that she could tell by the victim's voice that something was "wrong" with the victim.  S.K. testified that the victim and the Appellant were alone in the bedroom and that she kept looking in the bedroom because "something wasn't right."  Although physical evidence did not link the Appellant to the crimes, the Appellant gave three different versions of the events.  In his first jailhouse telephone conversation with H.S., the Appellant told her that he only rubbed the victim's stomach.  A few days later, he told her that he awoke to find his hand between the victim's legs and the victim "pleasuring herself" with his hand.  H.S. acknowledged that while she initially thought the victim was lying, her second conversation with the Appellant caused her to believe the victim.  At trial, the Appellant testified that his hand was not between the victim's legs but was "headed that way."  In our view, the Appellant's three his inconsistent statements to H.S. and the jury were extremely damaging.  Therefore, based on the foregoing analysis, we conclude that the trial court's error was harmless beyond a reasonable doubt.

### III.  Conclusion

Upon our review of the record and the parties' briefs, we conclude that the evidence is sufficient to support the convictions but that the trial court erred by allowing testimony about the Appellant's invoking his right not to speak with Sergeant Stanfill.  However, we also conclude that the error was harmless.  Accordingly, we affirm the judgments of the trial court.

_____
NORMA MCGEE OGLE, JUDGE